T.C. Memo. 2005-88

UNITED STATES TAX COURT

KENNETH HAWKINS, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 1468-03L.                     Filed April 19, 2005.

Kenneth Hawkins, pro se.

<u>Vivian N. Rodriguez</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

GERBER, <u>Chief Judge</u>:  On January 2, 2003, respondent sent petitioner a Notice of Determination Concerning Collection Action(s) Under Section 6320[1] and/or 6330 (notice of

_____

[1] Unless otherwise indicated, all Rule references are to the Tax Court Rules of Practice and Procedure, and all section references are to the Internal Revenue Code in effect for the years at issue.

determination), in which respondent sustained the filing of a Federal tax lien for petitioner's 1993, 1995, and 1996 tax liabilities. Petitioner had previously made two offers-in-compromise regarding these tax liabilities. Respondent rejected the first offer and returned the second.

The issue for consideration is whether respondent abused his discretion by sustaining the filing of the Federal tax lien.

FINDINGS OF FACT[2]

Petitioner resided in Pompano Beach, Florida, when the petition in this case was filed. He was self-employed for taxable years 1993, 1995, and 1996 (collectively, the subject years), operating a business known as "Professional Investigations and Consulting Inc.". Petitioner filed untimely tax returns for all subject years, with unpaid tax liabilities for 1995 and 1996 and a small refund for 1993. At all relevant times, petitioner had an unpaid Federal income tax liability outstanding for each of the subject years, much of which arose out of self-assessment.[3] Petitioner was not married and did not file joint returns for the taxable years under consideration.

---

[2] The parties' stipulation of facts is incorporated by this reference.

[3] All of the 1995 and 1996 liabilities arose from unpaid tax shown on petitioner's self-assessed tax returns, while an audit for the 1993 taxable year resulted in a deficiency determination for that taxable year.

Petitioner did not petition this Court to redetermine any of the tax liabilities, and the underlying tax liabilities are not in dispute.

Petitioner married during 1997, and on February 10, 1997, he and his wife purchased a residence as tenants by the entireties. Petitioner contributed $50,000, or one-half of the downpayment.

Between October 25, 1994, and December 2, 1997, respondent assessed tax and additions to tax against petitioner for 1993, 1995, and 1996, based on audit examinations and amounts shown as due on income tax returns. On December 3, 1997, petitioner sent respondent a Form 656, Offer-in-Compromise (first offer), based on doubt as to collectibility for the subject years, offering to settle the total outstanding tax liabilities for $16,209. At that time, petitioner's outstanding and unpaid tax liability was $26,266.06. Petitioner on Form 433-A, Collection Information Statement for Individuals, claimed that he had a 50-percent interest in his home and monthly net business income and living expenses of $1,400 and $1,648, respectively. On February 13, 2001, respondent sent petitioner a notice rejecting petitioner's first offer, stating that the amount owed was legally due and appeared to be collectible.

On September 5, 2001, petitioner submitted a second offer-in-compromise (second offer) for the subject years, this time for $2,200. In the second offer, petitioner's only reference to his

wife's physical condition was the statement: "my wife is unemployable. She is on Social Security Disability and earns no income." At that time, petitioner's total outstanding tax liability had increased to $38,165.32. Petitioner claimed on the Form 433-A that he had a 25-percent interest in his home and monthly net business income and living expenses of $2,550 and $3,384, respectively.[4] On Form 433-A, petitioner explained his home ownership as follows: "As I borrowed my contribution toward the purchase of the home, and as a result of the fact that my wife's assets were the basis for the ability to obtain the mortgage in the first place, my interest in the house is 25% while hers is 75%." On June 17, 2002, respondent returned the offer, stating that petitioner did not have any changed circumstances and that the offer was not materially different from the prior offer.

---

[4] The total living expenses for both offers were calculated by petitioner as follows:

| Expense | First Offer | Second Offer |
| --- | --- | --- |
| National standard[1] | $448 | -0- |
| Housing/utilities | 1,000 | $2,042 |
| Transportation | --- | 800 |
| Health insurance premium | 200 | 340 |
| Taxes | --- | 100 |
| Life insurance | --- | 102 |
| Total | 1,648 | 3,384 |

[1] Includes clothing and clothing services, food, housekeeping supplies, personal care products and services, and miscellaneous.

For the first offer, respondent accepted petitioner's claimed amount of monthly business net income but determined petitioner's allowable living expenses to be $433 on the basis of the national standard expenses table amount. For the second offer, respondent determined petitioner's net monthly business income to be $3,108, on the basis of petitioner's claimed revenue and expenses after disallowing some expenses that were double-counted as both business and personal expenses. To estimate petitioner's living expenses, respondent first computed petitioner's and his wife's shares of monthly income, on the basis of the recomputed $3,108 income and petitioner's wife's $1,638 of Social Security and interest income reported for her 2000 taxable year. On the basis of this information, respondent determined that petitioner generated 65 percent of the income and petitioner's wife generated 35 percent of the income.

Respondent then applied this percentage to recompute petitioner's expenses on the basis of petitioner's own calculations or amounts indicated for local or national standards. Respondent allowed the full amount of the claimed life insurance expense but prorated petitioner's claimed health insurance premium and taxes by 65 percent. Also, respondent allowed the full Broward County local standard amount for transportation but allowed only a 65-percent prorated amount of the local standard for housing and of the national standard expense.

Respondent also determined, for both offers, petitioner's equity in assets, on the basis of petitioner's submitted information, statements from third parties, and a review of public records. Respondent determined the value of petitioner's home to be $342,096 for the first offer, on the basis of a valuation by the Broward County Property Appraiser. For the second offer, respondent determined the value of petitioner's home had increased to at least $610,000, because a similar home with a tax assessment lower than petitioner's home had sold for that much in the same development. The combination of petitioner's equity and earnings multiple resulted in a determination that petitioner's reasonable collection potential (RCP) exceeded both the amount of the offer and the outstanding tax liability for both offers.[5]

---

[5] The calculations can be summarized as follows:

|  | First Offer | Second Offer |
|---|---|---|
| Equity in home[1] | $20,688 | $41,746 |
| IRA | 2,000 | 1,809 |
| Cash on hand |  | 5,738 |
| Net value of assets | 22,688 | 49,293 |
| Monthly income | $1,400 | $3,108 |
| Less: Expenses | (433) | (2,423) |
| Disposable income | 967 | 685 |
| Multiple | x 48 | x 48 |
| Value of income | 46,416 | 32,880 |
| Reasonable collection | 69,104 | 82,173 |
|  |  |  |
| Tax liability | 26,266 | 38,165 |
| OIC | 16,209 | 2,200 |

[1] Value based on 50 percent ownership for first offer and 25 percent ownership for second offer.

On June 24, 2002, respondent filed a notice of Federal tax lien on petitioner's property. On June 28, 2002, respondent sent petitioner a Notice of Federal Tax Lien and Your Right to a Hearing. On July 3, 2002, petitioner filed a Form 12153, Request for a Collection Due Process Hearing. Petitioner attended the October 24, 2002, hearing but did not present any collection alternatives or make any additional offer and refused to consider any collection alternatives that did not entail removal of the tax lien. On January 2, 2003, respondent sent petitioner a notice of determination in which the filing of the Federal tax lien was sustained.

## OPINION[6]

Petitioner made two offers in this case to settle his Federal income tax liability. Respondent accepted neither offer, then placed a Federal tax lien on petitioner's property. We

---

[6] Petitioner served untimely discovery requests upon respondent. In addition, petitioner attempted to offer documentary evidence with his posttrial brief. Petitioner argues that he has been prejudiced by not being able to gather or submit evidence necessary to adequately present his case. Petitioner did not timely move the Court to compel discovery. See Rule 104(b). More importantly, petitioner has provided no evidence that respondent failed to comply with petitioner's requests or misled petitioner in any way. Finally, we will not treat documents attached to briefs as evidence. Rule 143(b); Clifton-Bligh v. Commissioner, T.C. Memo. 2003-44. We note that, even if the documents offered by petitioner were admissible, they would not change the outcome of this case.

decide whether respondent abused his discretion in filing the lien. That question depends on whether respondent's failure to accept petitioner's offers was an abuse of discretion. Nearly 4 years separated the first and second offer, and the second offer was substantially less than the first. Because the making of the second offer was so long after the first and the second offer preceded the filing of the lien, we need to consider only whether respondent abused his discretion in rejecting the second offer.[7]

Section 6320 provides that a taxpayer shall be notified in writing by the Secretary of the filing of a Federal tax lien and provided with an opportunity for an administrative hearing. Sec. 6320(b). Hearings under section 6320 are conducted in accordance with the procedural requirements set forth in section 6330. Sec. 6320(c).

When an Appeals officer issues a determination regarding a disputed collection action, a taxpayer may seek judicial review with the Tax Court or a District Court, as appropriate. Sec. 6330(d); see Davis v. Commissioner, 115 T.C. 35, 37 (2000); Goza v. Commissioner, 114 T.C. 176, 179 (2000). Where the validity of the underlying tax liability is properly at issue, the Court will review the matter de novo. Sego v. Commissioner, 114 T.C. 604, 610 (2000). However, when the validity of the underlying tax is

---

[7] We consider the first offer only to the extent helpful to determine whether respondent abused his discretion in rejecting the second offer.

not at issue, the Court will review the Commissioner's administrative determination for an abuse of discretion. Id.; Goza v. Commissioner, supra at 181-182. Petitioner does not dispute the validity of the underlying tax. Accordingly, our review is for an abuse of discretion.

We do not conduct an independent review of what would be acceptable offers-in-compromise. We review only whether the Appeals officer's rejection of the offer-in-compromise was arbitrary, capricious, or without sound basis in fact or law. Woodral v. Commissioner, 112 T.C. 19, 23 (1999). The Court considers whether the Commissioner abused his discretion in rejecting a taxpayer's position with respect to any relevant issues, including offers of collection alternatives, which include an offer-in-compromise. See sec. 6330(c)(2)(A).

Section 7122(a) authorizes the Secretary to compromise any civil case arising under the internal revenue laws. The three standards that the Secretary may use to compromise a liability are doubt as to liability, doubt as to collectibility, and the promotion of effective tax administration. Sec. 7122(c)(1); sec. 301.7122-1T(b), Temporary Proced. & Admin. Regs., 64 Fed. Reg. 39024 (July 19, 1999).[8] Petitioner bases both offers on doubt as

---

[8] Sec. 7122(c) is effective only for offers-in-compromise submitted after July 22, 1998. Internal Revenue Service Restructuring and Reform Act of 1998, Pub. L. 105-206, sec. 3462, 112 Stat. 764. Sec. 301.7122-1T(b), Temporary Proced. & Admin. Regs., 64 Fed. Reg. 39024 (July 19, 1999), is effective for offers submitted after July 19, 1999, but sec. 301.7122-1,

to collectibility.

Section 7122(c) provides the standards for evaluation of such offers. Under section 7122(c)(2):

(A) * * * the Secretary shall develop and publish schedules of national and local allowances designed to provide that taxpayers entering into a compromise have an adequate means to provide for basic living expenses.

(B) Use of schedules.--The guidelines shall provide that officers and employees of the Internal Revenue Service shall determine, on the basis of the facts and circumstances of each taxpayer, whether the use of the schedules published under subparagraph (A) is appropriate and shall not use the schedules to the extent such use would result in the taxpayer not having adequate means to provide for basic living expenses.

Under the regulations for doubt as to collectibility cases:

A determination of doubt as to collectibility will include a determination of ability to pay. * * * To guide this determination [of the amount of the taxpayer's basic living expenses], guidelines published by the Secretary on national and local living expense standards will be taken into account. [Sec. 301.7122-1T(b)(3)(ii), Temporary Proced. & Admin. Regs., supra.] Thus, use of the national and local average statistics

published by the Internal Revenue Service is an appropriate

method to determine a taxpayer's monthly expenses. By using

national and local averages for some of petitioner's expenses

Proced. & Admin. Regs., applies to offers pending on or submitted on or after July 18, 2002. We do not need to address the applicability of the statute and the regulations to the first offer because we focus on the second offer. The second offer was made on Sept. 5, 2001, and returned on June 17, 2002, after the effective date of the statutory change and the temporary regulation but before the effective date of the new regulation. The statute and the temporary regulation are therefore effective for the second offer. See Galvin v. Commissioner, T.C. Memo. 2003-263, for a discussion of the addition of sec. 7122(c).

rather than petitioner's submitted expenses, the Appeals officer characterized petitioner as able to provide for basic living expenses. Thus, the Appeals officer did not violate statutory limits by using the tables. See sec. 7122(c)(2)(B). In addition, petitioner has not shown that his submitted expenses were more appropriate than the national or local averages. Respondent's proration of some of petitioner's expenses was appropriate because even though petitioner claims to incur all of the household expenses because of his wife's disability and lack of income, information returns show that his wife still generates passive income. While that income should not be considered in determining petitioner's collection potential, it should be considered in determining petitioner's responsibility for shared living expenses. 1 Administration, Internal Revenue Manual (CCH), sec. 5.8.5.5.3, at 16,342. Accordingly, respondent's use of the national and local averages combined with a prorated expense allowance was a reasonable way to estimate petitioner's expenses.

The denial of petitioner's offers was based on objective computations of petitioner's disposable income and assets, computed separately for each offer. The revenue officer even considered the alleged decrease, to 25 percent, in petitioner's equity ownership in the home between the first and the second

offer.[9] Respondent refused the second offer after applying the
national and local averages to estimate petitioner's expenses
because the RCP exceeded the full amount of the tax liability and
was certainly much more than petitioner's offer. In fact,
petitioner's second offer falls short of a reasonable offer even
if his own calculation of expenses is used. The equity in
petitioner's home alone exceeds both the offer and the full
amount of the tax liability, even at 25-percent ownership. Even
if we recalculated petitioner's RCP in a manner most favorable to
petitioner, using a negative multiple of petitioner's cashflows
with which he could offset equity in his other assets,[10] the RCP
would far exceed petitioner's $2,200 offer and cover most of the
outstanding $38,165.32 tax liability.[11] Thus, petitioner's

---

[9] Calculation of 50-percent or only 25-percent home
ownership also shows that respondent in no way considered
petitioner's wife's assets in determining petitioner's reasonable
collection potential, despite petitioner's allegations to the
contrary.

[10] The regulations and the internal revenue manual are both
silent on how to apply a negative future income. See sec.
301.7122-1T(c), Temporary Proced. & Admin. Regs., supra; 1
Administration, Internal Revenue Manual (CCH), sec. 5.8.5.5, at
16,339.

[11] The collection potential based on negative income is
shown in the following calculation:

|  |  | Second Offer |
|---|---|---|
| Equity in home |  | $41,746 |
| IRA |  | 1,809 |
| Cash on hand |  | 5,738 |
| Net value of assets |  | 49,293 |
| Monthly income | $3,108 |  |

second offer was inadequate.

Petitioner argues that respondent's haste in filing the notices of lien shows that respondent was predisposed to reject petitioner's second offer. Respondent, however, filed the Federal tax lien 1 week after petitioner's second offer was returned, and we are not persuaded that in doing so respondent failed to properly consider petitioner's second offer or abused his discretion in any other manner.

Amongst petitioner's numerous arguments only one has any potential for success--his allegation that he was suffering from economic hardship when he submitted the second offer. Petitioner relies on the internal revenue manual to support his position that even if he has the ability to pay the liability, an offer-in-compromise may be accepted if he suffers from economic hardship. See 1 Administration, Internal Revenue Manual (CCH), sec. 5.8.11.2.1, at 16,385-5. Factors related to economic hardship may include: (1) Long-term illness, medical condition, or disability may render the taxpayer incapable of earning a living, (2) the taxpayer may have a set monthly income and no other means of support, and the income is exhausted each month

| | |
|---|---|
| Less: Expenses | (3,384) |
| Disposable income | (276) |
| Multiple | x 48 |
| Value of income | (13,248) |
| Reasonable collection | 36,045 |

caring for dependents, and (3) the taxpayer may be unable to borrow against the equity in assets so that enforced collection is unlikely. Id. Petitioner alleges that the first and third factors are relevant to his situation.

Petitioner alleges that his wife's permanent disability makes the first factor relevant. The only evidence petitioner offered concerning his wife's disability was: (1) His statement in the second offer that his wife was unemployable, was on Social Security disability, and earned no income; and (2) his own general testimony that his wife became disabled in 1999. When he made his offer petitioner did not state the nature of her disability, present any evidence of its financial effect, or even allege that it caused economic hardship. The only monthly expense submitted in the second offer that could have related to his wife's disability was health insurance of $340, representing only 10 percent of the claimed expenses. The lack of any evidence or specificity to support petitioner's allegation left respondent without an adequate basis for making any findings concerning the financial impact of the alleged disability. There is no indication that the revenue officer summarily refused to consider any changed circumstances of petitioner. Rather, petitioner did not provide sufficient proof of the nature and extent of his alleged hardship.

Furthermore, when economic hardship is a factor in a doubt-

as-to-collectibility situation, the unique circumstances of the taxpayer to be considered in determining the taxpayer's reasonable basic living expenses do not include the maintenance of an affluent or luxurious standard of living.  Sec. 301.7122-1T(b)(4)(i), Temporary Proced. & Admin. Regs, 64 Fed. Reg. 39024 (July 21, 1999); sec. 301.6343-1(b)(4)(i), Proced. & Admin. Regs. Substantial equity in a home worth at least $610,000 would weigh against a finding that petitioner was suffering economic hardship when he made the second offer.

Moreover, petitioner's allegations with regard to his home ownership show that petitioner's assertions are unreliable. Petitioner admitted on cross-examination that he made a 50-percent, $50,000 initial contribution to the downpayment.  In addition, he stated in his first offer he had a 50-percent interest in his home before his wife's disability.  He then alleged in his second offer that his home equity had dropped to 25 percent after the disability, even though he alleged that his wife's condition necessitated his making all the mortgage payments.  Even though respondent accepts this decreased ownership for purposes of the second offer, petitioner's attempts to show a reduction in equity are superficial at best. Irrespective of petitioner's actual equity position, his inconsistent, self-serving explanations show that his allegations regarding his economic well-being and alleged hardship are

unreliable.

Next, petitioner argues that the third factor of economic hardship, the inability-to-borrow factor, is relevant to his situation. See supra p. 14. Citing 1 Administration, Internal Revenue Manual (CCH), sec. 5.8.11.2.1, at 16,385-5, petitioner alleges that the existence of the Federal tax lien makes it impossible to borrow against his home because "in today's financial market credit scoring is everything." The only evidence that petitioner offers is Washington Mutual's general policy:

> Federal tax liens do not subordinate to any other liens.
>
>> If the transaction is a refinance and the applicant has entered into a repayment agreement, the lien (which is also evidenced in the title report) must be paid in full at closing.

At the section 6320 hearing, the Appeals officer stated that respondent would be willing to sign a certificate of subordination to subordinate the lien to a new lender. Financing could be available in this situation. Most importantly, petitioner has not shown that the lien affected his ability to borrow, or that he has attempted to borrow only to be thwarted by the existence of the lien. Therefore, it appears that petitioner had sufficient equity in his home against which he could borrow.

In sum, without more specific evidence of petitioner's wife's condition, respondent could not make any findings as to

his economic hardship. Moreover, even if respondent used all the expenses petitioner submitted with the claim, petitioner's second offer was still unreasonably low. Accordingly, respondent did not abuse his discretion by rejecting petitioner's second offer.

Under section 6320, the Appeals officer must consider collection alternatives as well as whether any proposed collection action balances the need for efficient collection of taxes with the legitimate concern that collection be no more intrusive than necessary. Secs. 6320(c), 6330(c)(2)(A)(iii), (3)(C). Even considering the circumstances in a light most favorable to petitioner, petitioner had the ability to pay over $36,000 yet offered only $2,200 to compromise the outstanding $38,165.32 tax liability. Petitioner suggested no reasonable collection alternatives and would not even entertain any collection alternative that did not involve the removal of the Federal tax lien. In light of petitioner's inflexible stance, respondent's collection activity was no more intrusive than necessary. The Appeals officer thus complied with the requirements of sections 6320(c) and 6330(c) when he conducted the hearing and made a determination to keep in place the lien on petitioner's assets.

Petitioner has the ability to pay his undisputed tax liability. Most of the liabilities that respondent is attempting to collect were due with the self-assessed returns petitioner

filed nearly a decade ago.

We have considered all of the contentions and arguments of the parties that are not discussed herein, and we find them to be without merit, irrelevant, or moot. We hold that respondent did not abuse his discretion and correctly determined to proceed with collection.

To reflect the foregoing,

<u>A decision will be entered for respondent</u>.